IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

MARY DEAN,

           Plaintiff,

vs.                                      Case No. 05-1165-JTM

THE BOEING COMPANY,

           Defendant.

MEMORANDUM AND ORDER

This is a race discrimination action by plaintiff Mary Dean against her former employer, The Boeing Company, for failing to promote her to a management position in 1997. Dean continued to work for Boeing until she was laid off in 2002. In 2003, Dean retired from Boeing.

Dean was a named plaintiff the class action entitled *Williams v. The Boeing Company* (Case No. C98- 761WD), which was filed on June 4, 1998, in the United States District Court for the Western District of Washington. In that case, Dean advanced several claims, including one identical to that presented here. By an Order dated May 18, 2005, Dean's claims were severed and transferred to the District of Kansas in *Dean v. The Boeing Company* (Case No. 02-1019-WEB) which advanced claims of gender discrimination against Boeing. Dean's other claims have been dismissed by stipulation. (Dkt. No. 37, 38).[1] The sole remaining claim is that Boeing discriminated

---

[1] Dean was also a named plaintiff in *Beck v. The Boeing Company* (Case No. C00-03-1 P) (W.D. Wash.), which asserted gender discrimination claims against Boeing. The Washington court denied class certification, and the matter was re-filed as *Dean v. The Boeing Company* in Kansas, with Dean alleging that Boeing denied her the 1997 promotion because of her gender. On November 26, 2003, the court in the Kansas case granted Dean's motion to remove her as a class representative, and that caption was changed to *Carpenter v. The Boeing Company*. Although no longer a class representative, Dean's gender discrimination claims remained pending in the *Carpenter* gender class action. The Court of Appeals subsequently upheld an award of summary judgment against the plaintiffs' disparate impact claim in that action. *Carpenter v. Boeing Co.*, 465 F.3d 1183 (2006).

against Dean on the basis of race when it denied her application for a promotion in 1997. The matter is before the court on Boeing's motion for summary judgment.

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In considering a motion for summary judgment, the court must examine all evidence in a light most favorable to the opposing party. *McKenzie v. Mercy Hospital*, 854 F.2d 365, 367 (10th Cir. 1988). The party moving for summary judgment must demonstrate its entitlement to summary judgment beyond a reasonable doubt. *Ellis v. El Paso Natural Gas Co.*, 754 F.2d 884, 885 (10th Cir. 1985). The moving party need not disprove plaintiff's claim; it need only establish that the factual allegations have no legal significance. *Dayton Hudson Corp. v. Macerich Real Estate Co.*, 812 F.2d 1319, 1323 (10th Cir. 1987).

In resisting a motion for summary judgment, the opposing party may not rely upon mere allegations or denials contained in its pleadings or briefs. Rather, the nonmoving party must come forward with specific facts showing the presence of a genuine issue of material fact for trial and significant probative evidence supporting the allegation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). Once the moving party has carried its burden under Rule 56(c), the party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts. "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a **genuine issue for trial**.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed.R.Civ.P. 56(e)) (emphasis in *Matsushita*). One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and the rule should be interpreted in a way that allows it to accomplish this purpose. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

Dean, who is African-American, worked for Boeing from February 13, 1985 to September 7, 2002, with various breaks in service for different types of leaves of absence during this time

period. At the time of her medical layoff in 2002, she held the position of Material Processor. On June 1, 2003, plaintiff retired from Boeing and began collecting monthly retirement benefits and health insurance from the company.

In March 1996, Boeing implemented a managerial selection program known as the First Level Management Selection Process ("FLMSP"). Any promotion to a first level manager position had to follow the FLMSP procedure. If a Boeing unit needed to fill an open management position, it submitted a requisition. The position was then advertised in the Boeing newspaper twice. The FLMSP assessment center then conducted orientation sessions twice a week for any open position. Since openings were posted for two weeks, a given position would be addressed at four separate orientation sessions. A Boeing employee who was interested in one of these positions had to attend one of the orientation sessions.

At the orientation sessions, candidates were given a number of handouts to help them prepare for the FLMSP process. The handouts included a resource guide for workers who wanted to enhance their professional development. This guide included information on off-shift and off-site classes that were available for Boeing Wichita employees to take on their own time. The Human Resources Department provided this information to candidates, but it was up to each individual candidate as to whether they took off-shift or off-site classes. There were no on-shift or on-site classes offered to prepare for the FLMSP process. In her response, Dean contends that "she believed that there were classes offered on-site and as [sic] indicated that she had talked to people who would so claim." (Dkt. No. 61 at 4). This hearsay fails to controvert the evidence presented by the defendant.

The criteria for promotion had five components:

(1) an experience record, which was a multiple page document on which the applicant was expected to describe his or her experiences and abilities in relation to the job description provided by the hiring organization;

(2) a work sample video test, which was a written test based on several videotaped hypothetical situations and scored by a computer scanner;

(3) a coaching exercise, which involved role playing an actual employee problem and which was scored by Boeing Human Resources employees;

(4) a written exercise, which was blind-scored by a standing team of three out of a group of four Boeing managers (from outside the hiring organization); and

(5) a structured interview by three Boeing managers, who asked the applicants questions off of an approved list of questions provided by Boeing's Human Resources.

Seniority was not a factor that was considered under FLMSP when evaluating a candidate for a promotion.

At the orientation session, interested employees were given a self-nomination form and a blank experience record which had a unique serial number printed on it. The employee would transfer the serial number from the experience record document to the self-nomination form. The self-nomination-form was scanned into the FLMSP database. Under the blind assessment process, the applicant was then identified only by the serial number. The experience record was a multiple page document on which the applicant was expected to describe his or her experiences and abilities in relation to the job description provided by the hiring organization and was required to be returned to the assessment center by a certain deadline.

Dean challenges whether the process was fully blind, noting that applicants also provided social security information and work history. But, aside from Dean's own speculation, there is no evidence that any such information was ever used by the assessors to ascertain who they were grading. There is no evidence that the assessors could or did actually use any applicant's social security numbers to identify the applicant individually. The experience records for the active candidates were provided, with only their serial numbers, to the hiring organization so that the second level managers in the area could score them. Each candidate's experience record was scored by three assessors. The assessors recorded their scores for the experience records on forms provided by the Human Resources Department.

The structured interview was scheduled by the assessment center staff. In the interview, each of the candidates was asked a set of questions by three assessors who were second level managers from the hiring organization. The assessors asked questions from an approved list of questions provided by Boeing's Human Resources Department, and scored the responses on forms provided by the Human Resources Department.

In addition to the structured interview and the experience record, which were specific to particular positions, active candidates were also required to complete three generic assessments, the scores of which were used for all positions for which any particular candidate applied. The three generic assessments, which were noted above, were: the *written exercise*, which was blind-scored by a standing team of three out of a group of four Boeing managers (from outside the hiring organization); the *work sample video test*, which was a written test based on several videotaped hypothetical situations and was scored by a computer scanner; and the *coaching exercise*, which involved role playing an actual employee problem and was scored by three Boeing human resources employees. These three generic assessments were not position-specific. They did not test the candidate on any certain skills or knowledge specific to a particular job opening, and were judged by Boeing's Human Resources Department or other Boeing employees, not by the hiring organization's managers.

Each applicant's completed written exercise had a cover sheet which contained the applicant's social security number and a serial number assigned to each applicant's written exercise. The serial number was then used on all pages of the applicant's written exercise, so that the assessors judging the written exercises could not see the applicant's social security number, or otherwise identify the applicant. This cover sheet was only attached to the individual's written exercise for tracking purposes, and the individual assessors did not have access to the cover sheet when they were scoring the applicants' written exercises.

A candidate's work experience in a particular organization had no bearing on his or her scores on the three generic components of the FLMSP tests. The tests were designed more to

5

measure the potential managerial success of the candidates, regardless of which position each was applying for.

There were five versions of the coaching exercise and three versions of the written exercise which were rotated among candidates. The Human Resources Department instructed candidates that they were not to share any information relating to the exams with other employees. Managers from the hiring organization did not know the content of these assessments. All assessments were done in the FLMSP assessment center and managers were not informed of any details relating to the assessments.

As the Boeing Human Resources Department received assessment score sheets, either from the generic or the specific assessments, it scanned them into its computer, which read the scores and ultimately generated one overall score for each candidate known as the KSAO (Knowledge, Skills, Abilities, and Other Characteristics). Based on the KSAO scores, Boeing's computers in Seattle then ranked the candidates in bands, with the first band being the highest. The Human Resources Department then generated a banded list of the active candidates, which showed the names of each of the candidates within each of the bands.

The banded list was provided to the hiring organization, which was generally required to offer the position to a candidate in the highest band. If there were no available candidates in the highest band (if, for example, all the candidates in the band had already accepted other positions), the hiring organization could offer the position to a candidate in the next highest band. If there were available candidates in a higher band , the hiring organization could offer the position to a candidate in a lower band only by providing substantial justification for doing so. The organization's director would have to sign off on each candidate who was bypassed.

In the three years that Linda Ohrt was responsible for administering the FLMSP process, she never saw a hiring organization skip over more than one band of candidates to hire a candidate from a lower band. In fact, it was rare for a hiring organization to even go down one band and offer the position to a candidate in a lower band when there were available candidates in a higher band.

In 1997, Boeing did not have a formal mentoring program for the FLMSP process.

In 2000, Dean discussed a mentoring program with Vernell Jackson, Director of Boeing's Materials organization, for the Materials organization. Later that year, Jackson announced that there would be a mentoring program in the organization.

In August 1997, the Materials organization determined it needed to fill the position of Manager – Receiving and Stores. The organization submitted a requisition, and the position was then advertised in the Boeing newspaper on two occasions. There were eighteen active candidates for the promotion.

After the candidates were scored on their experience records, structured interviews, and three generic assessments described above, the computer ranked the candidates in bands, with the first band being the highest and the fifth band being the lowest. The Human Resources Department then generated a banded list of the active candidates, which showed the names of each of the candidates within each of the bands. Within each band, the candidates were listed in alphabetical order and the hiring organization had the discretion to select a candidate within the band.

Employee FE[2] and Employee CW both scored in the highest band for the promotion. Both employees were offered the position; FE accepted the offer and CW declined the offer.

Because there were no other available candidates in the first band besides FE and CW, the hiring organization had to offer the position to a candidate in the second-highest band. The candidates in this band were: Robert E. Frey, Kent E. Schaal, Martin Starling, and Employee MS If the hiring organization wanted to offer the position to a candidate in a lower band than this second band, it was required to provide substantial justification for passing over the higher-banded candidates. Within the second band, the hiring organization had the discretion to offer the position to any of these four candidates. The organization offered the position to MS who accepted the offer.

Dean's application was assessed by ten different individuals. Specifically, plaintiff's experience record was scored by Rickey Lee, Sean Walsh, and Susan Funke. Her coaching exercise

---

[2]Certain employees are identified only by their initials, having been identified under seal.

7

was scored by Carol Blecha, Lynn Galliart, and Lisa Atcheson; her written exercise was scored by Carol Howard, John Barrier, and Connie Kiewel. Dean's structured interview was scored by Sean Walsh, Rickey Lee, and Swede Asmann; the work sample video was computer-scored. Only four of the ten assessors were from the hiring Materials organization.

Dean scored eighteenth out of the eighteen candidates and was in the lowest of the five bands. She scored in the bottom 25% of all applicants for the promotion. FE, CW, and MS all scored in the top 25% of the applicants.

Dean was not the most qualified candidate for the promotion. She admitted in her deposition that, if an African-American should have received the promotion, it should have been Christian Counts, as he was more qualified than herself. She also admitted that another minority, Gilbert Carillo, was more qualified than herself.

On September 25, 1997, Dean received a feedback letter from Boeing detailing how her performance on the FLMSP tests compared to other candidates for the position. The letter compared her to the other candidates as to the KSAO dimension scores, and indicated she ranked lower than approximately 64% of the other candidates on the "working together" dimension, lower than 75% of the other candidates as to "planning and time management"; lower than 86% higher of the other candidates as to "interpersonal skills"; lower than 92% of the other candidates as to "teamwork and delegation"; lower than 86% of the other candidates as to "problem solving"; and lower than 97% of the other candidates on the four dimensions of "Boeing knowledge," "education and work experience," "positive work orientation," and "basic abilities."

On October 21, 1997, Dean was notified that she was not selected for the position.

FE's generic assessment tests were scored by six assessors, only one of whom was also an assessor for Dean's generic assessment tests, because his generic assessments from a previous application were utilized. The work sample video, also a generic test, was scored by a computer scanner. The overall test scores of CW, FE, and MS were all within the top quarter of the applicants

for the promotion. Their scores are shown in the following table, along with those of the plaintiff.

1997 Promotion Scores

Percentage of other Candidates Outscored

|  | FE | CW | MS | Dean |
| --- | --- | --- | --- | --- |
| Working Together | 69 | 86 | 42 | 36 |
| Planning and Time Management | 97 | 75 | 92 | 25 |
| Interpersonal Skills | 25 | 97 | 89 | 14 |
| Teamwork and Delegation | 86 | 97 | 92 | 8 |
| Problem Solving | 86 | 97 | 47 | 14 |
| Boeing Knowledge | 86 | 58 | 94 | 3 |
| Education and Work Experience | 92 | 97 | 58 | 3 |
| Positive Work Orientation | 92 | 97 | 86 | 3 |
| Basic Abilities | 81 | 92 | 97 | 3 |

The following minorities were all banded in the fourth band: Gilbert Carrillo (Hispanic), Christian Counts (African-American), and Derwin Turner (African-American).

Dean did not apply again for another management position with Boeing until 2001.

On or about November 25, 1997, Dean filed a discrimination charge with the Equal Employment Opportunity Commission, alleging that Boeing discriminated against her on the basis of her race, in violation of Title VII of the Civil Rights Act of 1964, when she was denied the 1997 promotion. On January 5, 1998, plaintiff filed a complaint with the Kansas Human Rights Commission stating the same allegations.

On August 31, 1998, the KHRC closed its investigation of plaintiff's charge because it was first filed with the EEOC. On September 18, 1999, the EEOC dismissed plaintiff's charge and issued

her a Notice of Right to Sue. Dean was a named plaintiff in *Beck v. The Boeing Company* gender discrimination case filed in the United States District Court for the Western District of Washington in February of 2000 (Case No. C00-03-1 P) and in *Dean v. The Boeing Company* filed in the United States District Court for the District of Kansas (Case No. 02-1019-WEB). In both cases, Dean claimed that Boeing denied her the 1997 promotion because of her gender.

Dean does not claim that the work sample video, which was a written test based on several videotaped hypothetical situations and was scored by a computer scanner, was discriminatory against her in any way because of her race.

Dean does not recall which Boeing Human Resources employees scored her on the coaching exercise and has no proof that she was discriminated against on the coaching exercise.

She claims that the coaching exercise, which involved role-playing an actual employee problem, was discriminatory because she was not "mentored" in preparation for the coaching exercise because of her race. Her evidence of this alleged discrimination is based on conversations she had with Boeing employees MS, Kim Clift, and Michelle Capps, all white, in which these employees allegedly told Dean they were mentored or coached in preparation for the various FLMSP tests with respect to several managerial positions. Of these three employees, only MS applied for the 1997 promotion. She also alleges that the fact that no African-American applicants were hired for the 1997 promotion is evidence that Boeing discriminated against her on the basis of her race in the scoring of her coaching exercise.

Dean does not know which Boeing managers scored the written exercise portion of her test, which was blind-scored by a standing team of three out of a group of four Boeing managers (from outside the hiring organization). Dean has no proof that Boeing managers discriminated against her on the written exercise, but believes that the Boeing managers were able to identify plaintiff's written exercise and give her low scores on the exercise because the cover sheet to the written exercise, which was used to track the applicant's scoring sheets, identified the name of the employee

10

and that the employee's score on the written exercise was eventually matched up with his or her name in order to attach a score to the individual's application.

For the structured interview assessment of plaintiff's application, she was interviewed by three Boeing managers. One of the three managers who interviewed plaintiff was African-American and the other two were white. Dean has no proof that Boeing managers discriminated against her on the structured interview, but bases her discrimination theory on the following allegations : (a) her allegation that the white employees who were promoted (MS and FE) had less seniority than the African-American employees who were not promoted; (b) the fact that Dean and other African-American applicants were not awarded the promotion; and (c) her allegation that she was asked different questions in the structured interview than other black applicants were asked.

Dean's evidence that the Boeing managers who judged the experience record component of her application discriminated against her on the basis of her race is: (a) her allegation that those who judged her experience record knew it was Dean's experience record they were judging, despite the lack of her name or social security number on the record; (b) the fact that no African-Americans received the promotion; (c) the fact that the white employees who were promoted (MS and FE) had less seniority than the African-American employees who were not promoted; and (d) her allegation that white employees (MS, Kim Clift, and Michelle Capps) were sponsored and mentored to help prepare for applying for promotions and African-Americans were not.  However, Dean has no evidence that her experience record had her name or social security number on it when it was submitted to the Boeing managers who judged it.

Dean also alleges she was denied equal treatment in getting on-site training to further help her get into management because of her race. She alleges that white workers with less shop experience in the Materials organization were promoted over her.

**Conclusion of La**w

The parties agree that Dean has presented a prima facie case of discrimination under the test set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). However, defendant Boeing contends that Dean was not promoted owing to a legitimate, non-discriminatory reason. Specifically, Boeing points to the five-factor FLMSP process for the evaluation of promotion candidates, which included

1. an **experience record** evaluation, which was an evaluation of the worker's experiences and abilities as they related to the job description for the desired job;

2. a **work sample video test**, a computer-scored written test in which the candidate responded to hypothetical videotaped work situations;

3. a **coaching exercise**, scored by Boeing Human Case Resources employees, in which the candidates engaged in role playing an actual employee problem;

4. a **written exercise**, scored by a standing team of three managers outside the hiring organization, who had no knowledge of any candidate's identity; and

5. a **structured interview** by three managers posing questions particular to the desired job.

Dean was the lowest ranked of the eighteen candidates. She always scored in the lowest 25% of the candidates on each aptitude measured. MS always scored in the highest 25%. She was always outscored by the workers chosen for promotion, FE, CW, and MS. Dean has admitted she was not the most qualified candidate.

The court finds that Boeing has advanced a legitimate non-discriminatory reason for its failure to promote Dean. As noted in *Goodwin v. GMC*, 275 F.3d 1005, 1013 (10th Cir. 2002), the employer "need only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus." "The relevant inquiry is not whether [the employer's] proffered reasons were wise, fair or correct, but whether [the employer] honestly believed those reasons and acted in good faith upon those beliefs." *Bullington v. United Air Lines*,186 F.3d 1301, 1318 (10th Cir.1999). Here, there is no substantial

evidence in the record which would demonstrate that the decision makers believed anything except that other candidates were better qualified than Dean.

Nor is there evidence from which the court could conclude that the proffered reason is a pretext for discrimination. Pretext may be demonstrated by showing "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Bryant v. Farmers Ins. Exch.*, 432 F.3d 114, 1125 (10th Cir. 2005).

Of the five factors in the selection process cited above, Dean concedes there was nothing discriminatory about the scoring of her work sample video test. Dean has advanced arguments suggesting that the remaining four elements of the evaluation process — the experience record evaluation, the coaching exercise, the written exercise, and the structured interview — were flawed. However, the court finds that plaintiff's arguments with respect to these elements of the evaluation are without merit and that she has failed to demonstrate that the process was a pretext for discrimination.

The plaintiff has offered no admissible evidence to support her challenge to any of these elements of the evaluation. With respect to experience record evaluation and that written exercise, Dean advances mere speculation that the evaluating managers might have known her race. But the evidence fails to support such speculation. The work record experience evaluations did not contain any identifying information at the time they were reviewed by the hiring organization. While the candidate's name and social security number were attached to a cover sheet of the written exercise for tracking purposes at one point in the process, the evidence establishes that identifying information was removed and was not on the exercise forms when they were presented to the evaluating managers for scoring the candidates.

More generally, Dean suggests that the evaluation process was flawed (a) because she did not receive any on-site mentoring to help her prepare for the evaluations, as white candidates

13

allegedly did, (b) because no black candidates were accepted for the promotion, and (c) because she had seniority over the white workers chosen for promotion.

Dean's first argument is similar to her argument about speculation that the evaluators somehow were able to divine her race in that it is not grounded on any admissible evidence. The evidence does establish that in 2000, Boeing implemented a program of mentoring for promotion candidates. But no such officially sanctioned mentoring existed in 1997, at the time of the promotion which is the basis for this litigation. Dean's evidence that such mentoring existed is pure hearsay. The uncontroverted evidence before the court establishes that, at the time of the challenged failure to promote, Boeing did not provide mentoring programs. Rather, it merely gave to all candidates at the time of their application information about where off-shift and off-site training could be obtained in the community, at which the worker could obtain managerial training on their own time.

Dean's argument that pretext is demonstrated because no African-American was actually promoted is insufficient to demonstrate pretext. The plaintiff's argument would effectively nullify the separate and distinct issue of whether pretext has been demonstrated. Under plaintiff's approach, pretext would always exist whenever a non-minority was promoted. This is not sufficient under the law. The plaintiff has an affirmative burden to show that the employer's rationale is unworthy of belief. *See Kendrick v. Penske Transp. Services*, 220 F.3d 1220, 1225 (10th Cir. 2000.) The plaintiff cannot, in attempting to meet this burden, rely solely on the fact that a non-minority was promoted and she was not. In *Butler v. Boeing*, 110 Fed. Appx. 71, 73 (10th Cir. 2004), the Court of Appeals stressed that more is required in supporting a claim of discrimination, observing that "although plaintiff is an African-American man, in noting that other people promoted were Caucasian, he fails to take into account their individual merit, experience, and relative qualifications for the jobs to which they were promoted. Not every insult, slight, or unpleasantness gives rise to a valid employment discrimination claim." Id. at 73 (internal quotation omitted).

Finally, Dean fails to show pretext by the fact the promoted workers had less seniority than she. An employer is not obliged to exalt seniority over every other consideration. The court cannot undertake to manage the defendant's business to correct mistaken business judgments in the absence of intentional discrimination. *See Young v. Dillon Companies, Inc.*, 468 F.3d 1243, 1250 (10th Cir.2006) ("our role is to prevent intentional discriminatory hiring practices, not to act as a 'super personnel department,' second guessing employers' honestly held (even if erroneous) business judgments").

In the present case, Boeing chose to create a promotion process which relied on a variety of criteria, not seniority alone. An employer is free to determine the requirements for a promotion, so long as those requirements are not a mask for discrimination. Nothing in the facts of the case establish that such was the purpose here. The ability of the employer to set its own standards for promotion was acknowledged in *Jones v. Barnhart*, 215 F. Supp. 2d 1195, 1204-05 (D. Kan. 2002). In *Jones*, the court held that the fact the plaintiff had more education than the other candidates for promotion was not evidence of pretext, when the promotion did not require a specific level of education. Here, Dean may have had more seniority than the other applicants, but seniority was not the controlling criteria for promotion.

In her response to Boeing's summary judgment motion, Dean argues that she has presented triable claims under both disparate treatment and disparate impact theories. However, there is no disparate impact claim in the present action. The Pretrial Order lists one and only one theory of recovery advanced by plaintiff:

**List of Plaintiff's Theories of Recovery.** Plaintiff asserts that she is entitled to recover upon the following theory:

> Defendant failed to promote plaintiff to the 1997 Promotion in violation of Title VII, specifically, by discriminating against her based on race. Specifically, plaintiff alleges disparate treatment, Section 703(a)(1), 42 U.S.C. 2000e2(a)(1), in that she was denied promotion to management in "Material" based on racial discrimination.

> All other claims in plaintiff's Amended Complaint have been dismissed by the Court.

(Dkt. No. 49, at § 6(a), p. 9). The Pretrial Order thus restricts plaintiff's theory of the case to one of disparate treatment, explicitly providing that "[a]ll other claims" were dismissed.

Nor does plaintiff's claim of disparate treatment present a triable claim. A claim of disparate treatment is a claim of intentional discrimination, which requires proof of such intent by either direct or indirect evidence. *EEOC v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1191 (10th Cir.2000). Plaintiff has presented no direct evidence of discriminatory intent. Nor, for the reasons stated above, has she successfully presented evidence which creates an inference of discrimination.

Instead, the plaintiff's statements in response to the motion for summary judgment merely emphasize the vacuum of admissible evidence of discrimination. Almost all of the facts presented by Boeing in support of its motion are explicitly admitted. As to the rest, Dean submits her personal and subjective belief as to various facts, coupled with statements that additional evidence may be presented at trial. In responding to the evidence showing that the 1997 promotion tests were blind-scored and that at the time Boeing did not provide on-site mentoring promotion, Dean states that "[s]he *believes* that the test was flawed and not blind and that is one reason why minorities were scored in the lowest band possible. She also has indicated as we have previously stated, that informal mentoring programs were available to people who eventually were successful in the promotion process." (Dkt. No. 61 at 7-8) (emphasis added). Dean "has testified that she *believed* that there were classes offered on-site and as [sic] indicated that she talked to people who would so claim." (Id. at 4) (emphasis added). "Suffice it to say that the Plaintiff's disparate treatment argument is *based on her conversations* and *the trial will be based on the statements of the individuals with whom she discussed the matter* and is self-evidently discriminatory." (Dkt. No. 63, at 4) (emphasis added).

The response does not offer any affidavits from individuals with personal knowledge of the existence of any actual mentoring programs in 1997. Fed.R.Civ.Pr. 56 and D.Kan. R. 56 both require that a party opposing a motion for summary judgment respond by citing admissible evidence

in support of facts which the party contends are in controversy.   The plaintiff here fails to meet this requirement.

IT IS ACCORDINGLY ORDERED this 25th day of April, 2007 that the defendant's Motion for Summary Judgment (Dkt. No. 52) is hereby granted.


s/ J. Thomas Marten
J. THOMAS MARTEN, JUDGE